Yes, sir. I like that name. Thank you. May it please the Court, my name is Peter Winslow Homer, and I represent appellant Robert Escobio here. I want to start off right at the outset because there was a question about mootness here, and there have been some developments that the Court should be aware of. The CFTC last week filed a motion in front of Judge King to hold Mr. Escobio in contempt yet again. And without waiting for any response from Mr. Escobio, late yesterday afternoon, Judge King entered an order holding Mr. Escobio in contempt yet again and directed that he turn himself in at 9 o'clock this morning. I assume that was for not making the $10,000 serial payments. That's correct. So I wanted to address that issue. If the Court has any questions about mootness or anything like that, we made three arguments essentially that under the Combs decision, this is an immediately appealable order because the only way you could purge this contempt was by paying the money itself. Secondly, we've made an argument as well is that this is not moot, and we've given you the case citations for that. And the third is the most obvious one that we're talking about here, which is capable repetition yet evading review. These orders are doing this, and if the government's position was correct, every time that Mr. Escobio failed to make a monthly payment of $10,000, they would come in here before we could get relief from this Court and make an argument that it's moot if he's gone ahead and discharged that. And so we would have no ability whatsoever to get review of that. You said that Judge King ordered him to turn himself in this morning at 9 a.m. Did he do so? He did not as far as I know. Did he purge the contempt? He did not. So he's made no payment and he has not turned himself in. That's correct. And my understanding, and again this has been telephonically relayed to me, is that the order itself describes that if he does not turn himself in by 9 o'clock in the morning, that the marshals are then to pick him up. So, um, y'all can lodge a copy of that order with, well I guess we can get it off CME-CF, but as soon as you get a copy of the order, lodge it with the Court with a copy to opposing counsel. Yes, sir. We'll do so. So there are, apart from that, there are two aspects to this appeal. The first is what I describe as being a threshold legal issue. Doesn't the government have to use the exclusive and what the statute describes as mandatory civil procedures that Congress gave it to enforce a restitution judgment under the Debt Collection Act itself? Or can the government skip that statute altogether and simply call upon the Court's supposed inherent equity powers at the very start? And this Court has already answered that question in the Bradley decision written by Judge Oflad, holds that equity powers are unavailable when Congress has already prescribed adequate remedies. And this Court has already repeatedly recognized the statute's enforcement procedures are more than adequate. There's a series of decisions that this Court has said that's, that's case. Congress put the statute in place, carefully constructed it, calibrated it, described what those powers are, and they are extensive. And in the Bradley decision, Judge Oflad wrote, which is that they should use those, whether it's the U.S. attorney or any other officer of the United States, in order to collect a judgment itself like that. So... But Bradley had some unusual facts. And in that case, the government had taken over the criminal corporation and already controlled all its funds. And so that does make it a somewhat unique posture. And if you look at the Judge Oflad opinion, he does go on further to say that if for some reason more money is needed to pay the restitution, the Court can enforce payment to the victims via its contempt power. So how is this not a clear endorsement of the CFTC's view here? Thank you for asking that, Your Honor. So that dealt with the criminal defendants. And in the criminal arena under 18 U.S.C. section 36113a, it specifically allows that when an order of criminal restitution is entered, it permits an order of contempt. So in this situation, what happened was, even though it was in the criminal context, and this was a RICO case that went on, there were people who were parties to the appeal who were not criminal defendants. They were people who they had received properties, and they were trying to get properties from them by way of really of a civil proceeding. And that was what... And what Judge Oflad said was, what they were attempting to do was to have an appointment of a receiver who would attempt to recover the property from those individuals. And if they failed to do so, they would then go and seek to hold them in contempt. So the simple answer is, that the thing that distinguishes that language which you're referring to, Your Honor, is both in the act itself, where it recognizes the possibility where you could get criminal contempt on some other basis, and Title 18 section 3613a specifically allows for a criminal defendant who's been held responsible for restitution can be held in contempt. Civil defendants, that isn't the case. And so that's the thing that distinguishes that. So really what you have here, and this is why this is an important issue, is that the government made no effort whatsoever to avail themselves of the other rights. They never came in and tried to issue a writ of execution. They never issued writs of garnishment. They didn't ask for an installment plan. They didn't attempt, although they did take discovery afterwards with respect to this, they never availed themselves of any of the remedies which were available to them under the statute itself. And after Bradley and Combs itself, which is an earlier decision by this court, in which they said that you don't use in a civil context as an enforcement mechanism contempt citations in order to enforce a civil monetary judgment on something like that. So the government has attempted to step around that here by saying, well this really isn't a monetary judgment, but this is a classic monetary judgment on this. And it was customer losses which under the statute were proximately caused by a violation to the act. That's right out of the statute. It's compensatory damages on its face and contempt is not available under those circumstances. The second part of our challenge on this is whether the final judgment and the record actually support a contempt sanctions. There are three factors that was reversed in part and reduced by $560,000 to $1.5 million. And that all happened while the show cause hearings were going on. And for that reason, we maintain that Judge King didn't even have jurisdiction to proceed in that fashion. The final judgment is also vague. If you take a careful look at it, there is language in there which admits of a construction which would allow Mr. Escobia to make partial payments. And we're able to demonstrate to you that this wasn't something that we just dreamed up. At his deposition, which was taken in aid of execution here, Mr. Escobia was asked that very question. And it is the CFTC that pointed out to him that he could make partial payments under the terms of that order. So if you're going to have a contempt citation, you have to have a clear and unambiguous order. And one of these things, one of the arguments that we have is that this was ambiguous, that he could in fact make partial payments. The third reason is, is that the contempt order here actually ignores the statutory exemptions which were there. And the statute itself incorporates state law protections here. Mr. Escobia had property that he owned jointly with his wife by way of bank accounts. He had homestead protection. All those. What the government is going to try to tell you is here is like, well, wait a minute. We can cite a whole litany of other cases about that where courts have not where there's a restitution order, but instead where there's been a disgorgement order. And the courts who have looked at that have said in the past that a disgorgement order is different. It is in the nature of an injunction and therefore it is compliance with an injunction. Now, I don't believe that analysis is correct anymore in light of the Kokesh decision by the Supreme Court when they said that disgorgement is a penalty and the statute itself that we're those cases are probably no longer good law, but that's how they analyzed it. They're not able to point to any other opinion other than the Blue Hippo decision that they say that effectively a monetary judgment like this is something that won't lead to contempt. And Blue Hippo was reversed by the Second Circuit. And so there's no good law for them on that other than these disgorgement cases, which are easily distinguishable. So from our perspective, we think that the analysis here is very simple and very straightforward. We focus in on the statute's claim terms and its structure. It's a simple matter of statutory interpretation on this. Is the judgment a debt? And restitution is a debt as defined under the statute itself. And that means under 3001A that the procedures that Congress set out apply here. And those are organized in are the exclusive with one exception. And that's under 3001B. And that is if Congress specified different procedures in a specific restitution statute itself. So that's what we call step two in the analysis on this. But what about 3003C that says this chapter shall not be construed to supersede or modify the operation of the authority of a court to exercise the power of contempt under any federal law? Yes, under. And that's the next step, which is under any federal law. So what you have to do is then go look at the Commodities Exchange Act itself and see whether there is a remedy of contempt provided for under that statute. A good analog to that would be the criminal statute, which I just referred to, which would allow contempt for a restitution judgment against a criminal defendant. You can look high and low in the Commodities Exchange Act and there is no such empowerment there. What they attempted to do is create that out of whole cloth. And so the problem that you have here with the government is what they asked Judge King to do is they went to him and said, really ignore the plain language of this statute and the methodology as it's set out there and its exclusivity. And instead what you should do is create this out of whole cloth. And that there would be these inherent powers that want to do this. And if you look at the section which Your Honor is referring to is in subsection, I believe it's C-8. And if you look at the preceding one, which deals with injunctive relief, C-7, that actually refers to the inherent power of a court there. There is no inherent power in C-8. So it's distinguishable in that sense. So Bradley has already rejected... And then C-7 more broadly accepts any inherent authority of a court to provide injunctive relief. That's correct. And there was no injunction here. There is a monetary judgment here, which he has not, according to the government, complied with. It's not an injunction. It's a monetary debt. And this is exactly the situation that was confronted in the Blue Hippo case when it went up to the Second Circuit. The argument there was like, oh, no, no, no, no. This is not a debt. It's an order which was there. And what they found was that was, in fact, a debt which was owed and it fell within the bankruptcy statute itself as being precluded. And the second point that we want to go through on this is that the idea is the district court's finding that this is the only case they have in support of the monetary judgments. As I said, the only case they have in support of that was the Blue Hippo decision. And that was reversed by the Second Circuit recently. So the stakes on this appeal, I want to stress, are enormous. This isn't just a matter that affects Mr. Robert Escobio. This is what the government is attempting to do with what I call regulatory creep, which is they want to keep inching ahead. Congress hasn't given these authorities, and instead what they want courts to do is create inherent powers for them to get a remedy, which Congress did not give them. Congress knows how to give the contempt power, and in this instance they didn't do so. Thank you, Mr. Palmer. Ms. Stooks. May it please the Court, I'm Ann Stooks, appearing on behalf of the CFTC, the Commodity Futures Trading Commission, which I refer to as the CFTC. This is an appeal from a district court order, which is really a continuing effort by the district court to prod a recalcitrant defendant into compliance. Mr. Escobio, the appellant, is not a victim in this case. He victimized a large number of people by committing— Therefore, anything goes. No, I disagree. I don't say anything goes. Why don't you argue what went goes under the law? I'm sorry, I didn't hear your question. Why don't you get to the legal issues as opposed to the attack on the defendant? I mean, I think he's sufficiently attacked in the facts of the case. You can address the legal issues. All right. So, the question in this case is, should this court affirm or should this court dismiss, for lack of jurisdiction, a contempt order that was structured to require a $350,000 upfront payment— How does he get appeal of the contempt order? How can he get appeal? Yes. Had he persuasively argued a motion for stay, which he lost in the district court and in this court? Had he been willing to post a bond, which he was unwilling to do and told the district court as much in the hearing on the motion for stay in the district court, he could have preserved his appeal rights for the contempt sanction that he suffered or that was imposed upon him for the $350,000 upfront payment. That's the only way he can appeal it in your view, in the commission's view? He could have stayed in prison and not purged himself of contempt, but those are the pathways. There's a Supreme Court case that we cite in our brief that if you want to purge yourself, you can get a motion, you can convince the court on a motion, you can obtain a stay, you can post a bond or make bail or stay in prison. But otherwise, purging contempt moots an appeal. So there are two jurisdictional points. So your argument is it is an evading review because eventually there'll be enough time that he's in prison that we can hear and decide the case? No, that is not my argument. My argument is that it's not evading review because he could have obtained a stay had he— No, he tried to obtain a stay, he didn't get one. So the question is, is it now capable of repetition yet evading review? I don't think it's evading review because he has now—until yesterday, he had not incurred a contempt sanction for the $10,000 a month payment that did occur yesterday. And that order is not currently before this court, but would be appealable. No, until yesterday it was evading review, but now it's not. The cases that apply that doctrine of capable of repetition yet evading review apply it when a defendant through no fault of his own or a litigant through no fault of his own cannot comply with the order. And so there are a couple of examples in the cases that we cited. One was a disabled child who was expelled from school, couldn't conform his behavior through no fault of his own, but because of his disability. Or an impoverished, drug-addicted defendant who could not, because he was indigent, could not comply with a district court's order to make payments. Or someone who's ordered to pay money and doesn't have the money. Had Mr. Escobio made that showing— I'm sorry, my question is, that's also an example of capable of repetition. The case that the Supreme Court decided on that indigent person who was failing repeatedly to make child support obligations, he was indigent and incapable of complying. That is not the situation with Mr. Escobio, who has lived this luxury, maintained this luxury lifestyle based upon all the evidence presented to the district court. His discretionary expenditures were over $14,000 a month. He lived in a luxury home. He still does. Drives luxury cars. Takes international trips. And has contemptuously prioritized other expenses over the victims. He paid more for his cable television than he paid the victims in this scheme that he masterminded. How much a month did he pay on the cable? I didn't see that. Something like $260 a month. And he paid about $100 a month to the victims, to the restitution fund. And I can point that out in our appendix if you'd like the citation. But there were a number of pieces of evidence to demonstrate the amount of money that was coming in and the amount of money that he was sending out. And they were very high expenditures that he was prioritizing over the restitution payments. He's mentioned the current order that's in place that he was supposed to surrender this morning. How much is in arrears? About $18,000. How many months is that? Two months. Two months. Okay. A little under two months. I thought it was $10,000 a month. It is. But he made, on his own initiative, he sent a letter saying that he was only going to pay some 10% of his imputed income, which nobody knew what that meant. And he didn't have leave of court to modify that payment structure. He didn't come in and ask the court for permission to modify the amount that he was paying. He just did it unilaterally. And the district court took a look at that and ordered him remanded back to custody until he makes the payments on the arrearage. I'm happy to get into the merits of why I would argue that this court should affirm the contempt sanction and why the FDCPA does not prohibit. That's counsel. That's why you're here. Yes, I just could talk about jurisdiction or the merits, whichever you'd be more interested in hearing. Covered jurisdiction. Let's get to the merits. Okay. The argument has been, in this case, for a number of years that the FDCPA, the Federal Debt Collection Practice Act, forbids the district court from entering a contempt sanction to enforce a restitution award. But under the CEA, the restitution award in this case is an equitable remedy. And this court held in the CFTC v. Wilshire case that the statutory grant in the of equitable remedies. And so a restitution equitable remedy is traditionally enforceable by contempt, which is an equitable power of the court. And under that structure, we argue that the FDCPA section 3003c8, which is where the power of contempt is granted by federal law, applies to this case because the CEA grants the district court authority to grant an equitable remedy, which is enforceable by contempt. And it traces back to this decision, this court's decision in CFTC v. Wilshire. That was the analysis that the district court applied. And we argue correctly so. And we also can see that in the Bradley case that the appellants argue. The Bradley case was specifically about the FDCPA. In that case, it was a criminal case, and there were two broad categories of remedies. One was a forfeiture, which the court determined was a remedy at law. It's a penalty. The second component of the judgment that was at issue in Bradley was restitution. So in Bradley, Judge Schofield wrote the opinion to say, the remedies at law may not be enforced by equity. So the government couldn't use a receivership to hold parties in contempt for failing to pay the forfeiture. But as to the equitable portion of that judgment, the restitution, contempt was the appropriate way to enforce that judgment. And so we would point to the Bradley decision as precedent for supporting the district court's decision in this case to use contempt to enforce the equitable remedy of restitution. Anything else? I'd be glad to address anything that you, that the court is interested in. I could go over the contempt standards which were met in this case, and I'd like to note at the outset, the burden is on the party seeking contempt to demonstrate a failure of compliance with a court order. That was demonstrated here. Mr. Escobio allocated great sums of money to discretionary expenditures and paid a pittance toward his restitution obligation. As a factual matter, the district court was without error in concluding that he had failed to comply with the final judgment. The burden then shifted to Mr. Escobio to demonstrate either that it was impossible for him to comply or to demonstrate that he had made all reasonable efforts to comply. He, given that opportunity, submitted evidence that he had over $900,000 in assets available to pay the judgment. And the court looked at that and held that he had willfully prioritized other expenditures over the restitution award. Part of his argument is those are exempt assets under state law. What's your response to that? My response to that is fundamentally the supremacy clause. State law exceptions do not apply in the context of this, of a federal court. And there are cases that we cite in our brief that say it doesn't matter if it was a jointly owned home. But it would matter if this had been a money judgment. It may have mattered if this was a case being litigated under the FDCPA. It may have mattered. Let me ask you one question. You were talking about equitable restitution. And the distinction between legal restitution and equitable restitution, equitable restitution is a restoration of funds. So does the CFTC have a process in place to restore these funds to the victims? We do. There's, in the final judgment, the court named the National Futures Association, which is an entity that regularly is like a monitor for restitution funds in CFTC cases. So the money is paid to the National Futures Association, which then disperses the funds to the victims. Which is analogous to criminal restitution, where the money's paid into the clerk's office and the clerk distributes it. I think so, yes. Under the supervision usually of government. Yeah. Okay. Thank you, Ms. Stutes. Thank you. Mr. Holman, six minutes. I think it's important that the court understand the position that Mr. Escobio's put in. As a result of the judgment that got originally from Judge King on this, they took away Mr. Escobio's ability to work in the industries that he'd worked in for over 35 years. They chose to do that and took away his livelihood on that. They actually then had him thrown in jail. He had a job at that point, earning a part-time as a pilot, somewhere between $30,000 and $40,000 a year. When he got incarcerated the first time like this, he lost that position as well. This suggestion that he has not abided by what's going on here is absolutely incorrect. If you look at the record, which is here, is that when he went ahead and did was, he individually, even though there's an exemption under Florida statute, which is incorporated in the act itself, it says that state law protections and exemptions would apply. He went ahead and liquidated his IRA, which Judge King referred to as about $300,000. After he paid the taxes that are associated with that, he remitted that amount immediately to them. Mrs. Escobio, who did not have to do that, liquidated her IRA as well, paid taxes on that as well, in order to purge that contempt as well. So this idea that somehow or another that there's been this refusal to abide by this, he did purge, I think it was the first, $360,000, $370,000 out of that. I like that. And the only way he was able to do that was by liquidating exempt assets and assets of his wife herself on this, something like. But the contempt order doesn't command where the restitution payments must come from. I mean, it's not. The contempt order does not specifically direct anything regarding exempt assets or whatnot. That's right, Your Honor, but here's what the problem is, and this is why the CFTC did what they did here, is they find the protections which are built into this act inconvenient for them. And so instead of going and availing themselves of the normal way to collect an adjudgment, execution, a levy, garnishments, attachments, even a payment plan that is described in the act itself, there would be an evidentiary hearing, and you would be able to make those kinds of arguments about why those are exempt or not. They cut through that and made the argument like, it doesn't matter, Judge, he's in contempt. Therefore, relying on those discouragement cases, those exemptions don't have an applicability. The government went ahead and did this to put as much pressure as they possibly could on Mr. Escobio, and they took an end run around the statute. And that's the bigger issue here that this Court should be aware of. If you sustain what they've done here like this, this agency, the FTC, the CFTC, the SEC, every one of them will be taking this as a roadmap, which is like if somebody doesn't pay the restitution award that's been entered or the discouragement award, we're going to go to the trial court and hold these people in contempt and incarcerate them in every instance. That is anathema to the idea that we don't have debtor's prison in here, particularly when it's the government who's doing that. What about the testimony that your client said he had $900,000 in assets? So if you look carefully what Judge King went through that, equity was about $550,000 in his house, which he owned prior to any of the involvement here, joint tenancies by the entirety with his wife. And the record evidence here is that Mr. Escobio and his wife went and attempted to get a second mortgage on that house in order to raise the money to be able to purge the initial contempt, and were unable to do that because no lender was going to do that while he had a judgment which had been recorded for $1.5 million. They simply weren't going to do that. CFTC didn't tell you that. They weren't candid with you about the fact that they inhibited or prevented his ability to be able to even get that source of capital. So if you look at that, it's $550,000 equity in the house, which is an exempt asset under Homestead Protection in Florida, and $300,000, which was his IRA, which is also an exempt asset. So what they've attempted to do here is really they want you to do is just ignore the structure of the statute itself. And what that did is that statute gave the government comprehensive, exclusive civil procedures. That's the language which is used in there. And if the court could take any reserve power away from, by way of Section 303, which is they're using that, and instead of the specified procedures, they aren't exclusive at that point. They're optional. And then the whole of the statute is gone. You would see the government agencies doing exactly what was done here in this instance. And that would be misuse of the contempt power rather than going through the collection processes, which they're normally remitted to on that. So that's a major step beyond what the court's powers are under Article III. And we think the statute is more limited than inherent powers. Other parts of that statute actually talk about inherent powers. I pointed you to subsections, I believe it's C-7, which refers to the inherent powers of injunctions. They make no such language included in there when they talk about contempt in there whatsoever. And in terms of reading contempt into the Commodities Exchange Act as an implied remedy, the controlling decisions foreclose that altogether. The Supreme Court has told us as litigants, and the courts as well, like that the days of implying remedies on a theory that Congress forgot to imply, they're over with. Their notion that like, when Congress put Dodd-Frank in place, that they forgot to include contempt in there, is somehow there should be implied. That's not what the Supreme Court has said to be done. It's admonishing lower courts that you don't imply those in that situation. That Congress knows exactly what it's saying and it says what it means on something like that. Thank you, counsel. We'll take that case under submission. And we're going to take a 10-minute break before we hear the glue case.